

**IT IS SO ORDERED.**
**Signed April 17, 2015**

Arthur S. Weissbrodt
**Arthur S. Weissbrodt**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: ] | Case No. 11-59479-ASW |
| ] | |
| ESTERLITA CORTES TAPANG, ] | Chapter 11 |
| ] | |
| ] | Date: November 3, 2014 |
| ] | Time: 10:00 am |
| Debtor. ] | |

**MEMORANDUM DECISION RE: VALUATION**

This matter comes before the Court on Esterlita Cortes Tapang's ("Debtor") Motion to Value Collateral located at 523 Burlingame Avenue in Capitola, California (the "Property") under 11 U.S.C. § 506 ("§ 506").  At the trial, Debtor was represented by attorney Francisco Aldana, and Creditor 523 Burlingame LLC ("Creditor") was represented by attorney David Wiseblood.  Debtor has asked the Court to set a property value which would have the effect of bifurcating Creditor's lien and avoiding the portion of the lien that exceeds the fair market value of the Property.

Neither Debtor nor Creditor presented evidence that valued Debtor's business operations at the Property.  Thus, for purposes of this decision, the Court limits its valuation analysis to the real property with its improvements, but without the business.

Having considered the evidence and arguments offered by the parties, the Court finds that the fair market value of the Property is $1,148,785.00. Because the County of Santa Cruz's claim for delinquent property taxes ($100,060.32) has priority over Creditor's claim, Creditor's claim is secured in the amount of $1,048,724.68. The remaining portion of Creditor's claim, $780,443.05, is unsecured.[1]

## I.    Issues Presented

As a threshold issue, the Court must first determine the date for valuing the Property. At trial, Debtor's expert, John Hibbard testified that he valued the Property as of December 2013. Creditor's expert witness report, performed by David Beccaria, was less concrete. The values in his report were as of March 2014, but Mr. Beccaria's testimony also opined that the Property would continue to increase in value from March 2014 onwards. As Mr. Wiseblood correctly pointed out at trial, courts use different valuation dates depending on the purpose of the valuation, and for purposes of valuation under § 506(a), the Property should be valued as of the effective date of the Plan. See also In re Dheming, 2013 WL 1195652, at *1 (Bankr. N.D. Cal. Mar. 22, 2013). The Court, however, noted that very often, the valuation trial will be held before the Plan is confirmed. This is the case here. Because the exact date for Plan confirmation is unknown, the Court advised the parties to agree on a particular date on which they would value the Property. The parties agreed that they would

---

[1]This calculation of 523 Burlingame's secured claim assumes that the County of Santa Cruz's claim has not increased post-petition.

2

value the Property as of December 2013. The Court has accepted that as the valuation date for Plan confirmation purposes.

Second, the Court must determine the fair market value of the Property. Debtor and Creditor have proposed two drastically different valuations for the Property. Debtor argues that the Property should be assigned a fair market value of $960,000.00. Debtor's expert, John Hibbard, arrived at this value by applying the Income Capitalization Approach. Creditor, on the other hand, contends the Property is worth $1,890,000.00. Creditor's expert, David Beccaria, arrived at this value using the Land Sales Comparison Approach.

One of the principal contentions between the two parties is how much it would cost, if any, to make the Property vacant. At present, Debtor is operating a residential care facility for the elderly (many of whom are seriously mentally and/or physically ill or impaired) on the Property, Golden Age Convalescent Hospital, Inc., ("Golden Age"). In order to make the Property vacant, Golden Age's operations would have to be shut down and its residents would need to be relocated. The cost to do so may affect the fair market value of the Property.

Thus, the primary task before this Court is to determine the appropriate method(s) of valuing the Property and then to assign a value to the Property. Only then can the Court determine to what extent Creditor's lien is secured by the Property.

## II. Findings of Fact

Debtor in this Chapter 11 case, Esterlita Cortes Tapang, owns the Property. The Property is located at 523 Burlingame Avenue,

3

Capitola, California, in the County of Santa Cruz. The Property currently has one large building on it. The building is 7,496 square feet; has 15 rooms; and was built about 53 years ago, in 1962. The Property is located on a "single assessor's parcel" (#035-094-34) which consists of four legal lots. Two lots face Burlingame Avenue and are zoned for residential use ("R-1"); the two other lots are zoned for commercial use ("CN") and are located on Capitola Avenue. In its entirety, the parcel totals .41 acres, or about 18,000 square feet.

On the Property, Debtor operates a 40-bed residential care facility licensed by the California Department of Health. The residential care facility primarily cares for elderly patients with serious mental illnesses. Debtor has been operating the facility since September 2000. The occupancy rate varies anywhere from 60%-80%; currently it houses 26 residents. The residential care facility is operated by Golden Age, a co-borrower on the underlying Note with Debtor. Golden Age leases the Property from Debtor at a rate of $14,000.00 a month.

Creditor claims a lien on the Property in the amount of $1,829,167.73. This is evidenced in Creditor's Proof of Claim filed September 6, 2013. At trial, Masha Levinson testified that as a member of 523 Burlingame LLC, she bought the Note for the Property, with a face value of $1,829,167.73, for $500,000.00.

The Note and Deed of Trust were originally held by Wachovia Commercial Mortgage Inc. ("Wachovia"), which was later acquired by Wells Fargo Bank ("Wells Fargo"). The Note shows that Debtor and Golden Age are co-borrowers on the Note and that Wachovia is the obligor. The Deed of Trust shows that only Debtor is the trustor

4

and Wachovia is the beneficiary.  There are no documents showing that Wachovia assigned its interest to Wells Fargo, or that Wells Fargo assigned its interest to Creditor.  However, Creditor's testimony that Creditor bought the Note is unrefuted.

The Claims Register also shows that the County of Santa Cruz Tax Collector has a secured claim in the amount of $100,060.32 as of the petition date for unpaid property taxes.

Golden Age is licensed through the Department of Health as a residential care facility specializing in providing non-medical residential services to persons over 60 years of age who are mentally impaired.[2]  Golden Age charges $136 a day for a bed; most of the residents' bills are paid for by the State of California.

### Established Facts

During the course of trial, the parties' experts agreed on a number of important facts which this Court accepts as established. First, 523 Burlingame Avenue is located on a "single assessor's parcel" which consists of four legal lots, two residentially zoned on Burlingame Avenue, and two commercially zoned on Capitola Avenue. It is feasible to build single family residences on a commercially zoned lot, or in the alternative, it would take little time and expense to convert the commercially zoned lots into residentially zoned lots.  Moreover, it would take little time and expense to "re-establish" the "single assessor's parcel" into four legal lots. One residence is capable of being built on

---

[2]The exhibits, including Mr. Hibbard's appraisal, were not admitted into evidence during trial, apparently through oversight. This Court issued orders informing the parties of this and ordering that if no objections were filed within two weeks, all exhibits would be deemed admitted. Neither party filed any objections. Accordingly, all exhibits are admitted for purposes of this decision.

5

each lot.  Mr. Hibbard agreed that Mr. Beccaria's "As Is" Comparable #1, 515 Burlingame, is a suitable comparable if the Property were to be sold as vacant land.  It would take about $50,000.00 to $60,000.00 to demolish Golden Age's 15-room, single story building, provided that it was completely vacated.

The 7,496 square foot building located on the Property, as well as the raw land, is uncontaminated.  Mr. Hibbard testified that he examined soil samples and the building and did not find any "risk factors" that would substantially impede the Property's sale, other than the cost to remove the residents.  Mr. Beccaria did not have access to the premises, but assumed that the Property was in environmentally sound condition.

Mr. Hibbard and Mr. Beccaria both agreed that they would value the Property as of December 2013 and that they would value the real property alone, with its improvements, but without its business.  Both experts opined that calculating fair market value requires the appraiser to consider "highest and best use" and that this principle is consistent with the Uniform Standards for Professional Appraisal Practice (the "USPAP").  Both experts agreed that the legal definition of fair market value is: the price a willing buyer would pay a willing seller in the relevant market, absent duress.  Both also agreed that market value assumes competent management of the Property.


### *Valuation of the Property*

Each side presented expert testimony as to the value of the Property.  Debtor offered testimony from John Hibbard, and

6

Creditor offered testimony from Masha Levinson and David Frank Beccaria.

### Testimony of John Hibbard

Mr. Hibbard has been an appraiser since 1977.  He has owned his own company, Meridian Valuation Group, since 1984.  He specializes in reviewing others' appraisals which are primarily performed for commercial banks.

Including reviews of others' appraisals, Mr. Hibbard has performed over 12,000 appraisals.  Mr. Hibbard is familiar with the USPAP and stated that his appraisal was performed in accordance with the USPAP.  Mr. Hibbard is certified by the State of California and holds a "G" certification, which is the highest certification in California (license number 009239).  He is a candidate for the designation of "MAI" - Member of the Appraisal Institute, and has completed all but one course for the MAI designation.

The Appraisal Certification Board certifies 400 people to teach; Mr. Hibbard is an instructor for the Board.  In addition, for three out of the last five years, he has lectured at the Chief Credit Officers' Symposium and will be lecturing at the Symposium this year, 2015.  He has also been a guest lecturer on the USPAP at a couple of community colleges.

For two years, Mr. Hibbard was a reviewer for the Office of Real Estate Appraisers.  He worked in the compliance department handling complaints about the quality of appraisals that were not in compliance with the USPAP or other applicable standards.  The poor reviews were sent to Mr. Hibbard.

7

Mr. Hibbard does not specialize in appraisals for bankruptcy court and does not testify often.  He does not specialize in appraising care facilities, and has reviewed only six residential care facility appraisals.  Almost all of his work is for banks; this includes appraisals and reviews of others' appraisals.  Mr. Hibbard has also done some appraisals for estate planning.

Mr. Hibbard prepared three appraisals for the Property: the first on August 1, 2012, for a value of $960,000.00; a revision of the first on December 27, 2012, for a value of $920,000.00; and a final report, on December 15, 2013, arriving at the first valuation of $960,000.00.  Mr. Hibbard stated that he was assigned to value the Property without the business.  Mr. Hibbard applied two Approaches to valuing the Property: the Income Capitalization Approach and the Land Sales Comparison Approach.

Mr. Hibbard began his testimony by identifying one of the key issues in his assignment: segregating the real property value from the business value.  Mr. Hibbard stated that 5% of the properties that he reviews are businesses such as hotels, gas stations, and care homes.  He said that when a sale of property involves the sale of a business, it is difficult for appraisers to separate one from the other.  Because the business value is "mixed" with the property value, it is difficult to ascertain what part of the sale price represents the business as opposed to the real estate.  Mr. Hibbard testified that the Small Business Administration mandates that appraisers take a course on this issue, and the Appraisal Institute teaches a special course on the subject using a textbook written by David Lenhoff.  Mr. Hibbard consulted with Mr. Lenhoff in preparing his report.

8

Mr. Hibbard maintains that because of these complications, the method for valuation which he preferred, the Income Capitalization Approach, is "not settled" in the appraisal community.  While Mr. Hibbard followed Lenhoff's methods, Mr. Hibbard stated that some appraisers still disagree with Lenhoff.  With regard to his Land Sales Comparison Approach, Mr. Hibbard believes that his analysis is generally accepted in the appraiser community.

Mr. Hibbard stated that the Income Capitalization Approach yielded the highest market value for the Property: $960,000.00. Mr. Hibbard's report states that the "steps in this approach include the calculation of gross potential rental income by comparison with similar properties, and estimation of expenses to determine net income.  The income stream is then capitalized or discounted to the value of the subject property."  In applying the Income Capitalization Approach, Mr. Hibbard used the "Abstraction Method."  The Abstraction Method asks how the cash flow of the business affects the value of the land and its improvements. Using cash flow to the business, Mr. Hibbard calculated income and subtracted operating expenses, which includes compensation to an investor.  This yields the highest price that a buyer would pay for the real estate and continue to operate the business. Mr. Hibbard stated that the Abstraction Method does not yield market value, and is not the "ideal" method of valuation. Mr. Hibbard testified that the ideal approach would be to look for sales of other empty facilities for comparison, but stated that he could not find any such comparables in his research.

Case: 11-59479   Doc# 568   Filed: 04/17/15   Entered: 04/17/15 15:09:30   Page 9 of 37

During trial, the Court repeatedly asked Mr. Hibbard how it was possible to input the cash flow of the business into the Abstraction Method's calculation and arrive at a valuation that only applies to the Property. Mr. Hibbard replied that using the cash flow allowed him to determine what portion of the income enhanced the value of the property and not the business. According to Mr. Hibbard, another way of applying this approach would be to determine the rental value of the Property.

It was unclear from Mr. Hibbard's testimony whether he believed the current use of the Property, as a residential care facility for the mentally ill or physically impaired, was the "highest and best use" of the Property.[3] Mr. Hibbard testified that the business as currently operated is unprofitable. Mr. Hibbard believed that the cost of maintaining 40 licensed beds and paying for nursing staff to be "inadequate to justify the continued operation." Mr. Hibbard believed that Golden Age should be "remodeled" to reduce the number of beds from 40 to 32 or 30, and the facility should not incur the cost to employ nurses who provide medical services. In addition, the facility should consider transitioning from accepting very ill patients who are only State-funded to accepting patients with less serious illnesses who are privately funded. Overall, Mr. Hibbard estimated that the above renovations would cost Golden Age around $450,000.00. Mr. Hibbard believed that these changes would make

_____

[3]On cross-examination, Mr. Hibbard clarified that "highest and best use" examines what use produces the highest value to the land. Mr. Hibbard explained that there are four "tests" which define "highest and best use." They are: (1) that which is reasonably probable and reasonable use of the property; (2) that which is physically possible; (3) that which is appropriately supported; and, (4) that which is financially feasible.

10

the business more profitable, thus increasing cash flow and the value of the Property.

Mr. Hibbard also calculated the market value of the Property using the Sales Comparison Approach. Mr. Hibbard used a "Land Study" to apply the Sales Comparison Approach. The Sales Comparison Approach values the Property without consideration of the business or the improvements – in other words, as if the Property were raw land. Mr. Hibbard determined that the value of the raw land on the Property was $500,000.00 to $600,000.00. Mr. Hibbard based this figure on an estimate that the land would sell for $30-$35 per square foot if it were already approved for development. Mr. Hibbard stated that when buyers buy raw land, the plans for development are usually pre-approved by the City or County. Mr. Hibbard stated that he found the price per square foot by using "Loopnet" to see all the pre-approved plans for raw land in the County of Santa Cruz and their respective prices.

Using Loopnet, Mr. Hibbard provided five comparables. Mr. Hibbard admitted that only four of the five were true comparables because the first one, 37 Airport Road, Watsonville, California, was very different from the Property. None of the comparable properties were located in the City of Capitola. Mr. Hibbard did not go into much detail about the comparables, but noted that Comparable #3, 1500 Brommer Street, Santa Cruz, California, had similar zoning as the Property, and Comparable #2, 100 Ocean Street, Santa Cruz, California, was very small compared to the Property. Mr. Hibbard stated that the Property's mixed zoning is problematic because most of the properties in the neighborhood are already zoned for residential use. It is unclear

11

1  why Mr. Hibbard felt that the mixed zoning was problematic when he
2  also testified that residences could be built on commercially
3  zoned lots, or in the alternative, that the zoning could be
4  changed with little push-back from the City of Capitola.

5      Mr. Hibbard also calculated the raw land value using a
6  supplemental "Abstraction of Market Value Approach."  Mr. Hibbard
7  included this supplemental report because he believed that the
8  rising prices of residential homes in the area may adjust the
9  findings in his final report, dated December 15, 2013.

10     The supplemental Abstraction of Market Value Approach report
11 valued the Property as raw land at $910,000.00.  Mr. Hibbard
12 arrived at this value by estimating the sales price of a dwelling
13 that could be built on one of the Property's four legal lots and
14 then deducting costs, which include construction costs, taxes,
15 insurance, and the largest cost: shutting down Golden Age, which
16 Mr. Hibbard believed to be $440,000.00, based on Golden Age's CPA
17 report.  Mr. Hibbard stated that no developer would buy the
18 Property and redevelop it into residential properties because the
19 developer would not want to incur the $440,000.00 cost of removing
20 the Golden Age residents.

21     In Mr. Hibbard's opinion, vacating the Property was a major
22 cost that drove down the value of the Property.  Mr. Hibbard
23 stated that he valued the Property "as is" which means that he
24 valued it with the Golden Age residents.  Initially Mr. Hibbard
25 estimated the cost to move the residents at $500,000.00 and then
26 decreased this number to $440,000.00 based on Golden Age's CPA
27 report.  Mr. Hibbard felt that this cost would be borne by a
28 buyer, not the seller/operator.  Mr. Hibbard analogized the

Case: 11-59479   Doc# 568   Filed: 04/17/15   Entered: 04/17/15 15:09:30   Page 12 of
37

residents to a "toxic condition" on the Property because they were very ill and had special needs and poor funding, making them unattractive candidates for other facilities.  Mr. Hibbard said that Golden Age was a "dumping ground" because the beds are so cheap; anyone buying the Property would inherit the problem.

Mr. Hibbard explained the nature of the cost in some detail. Mr. Hibbard estimated that it would take nine months to move the residents, and moreover, believed that the company's expenses during the shut-down would substantially increase because of "weight scale": premiums that must be paid to workers who know job loss is inevitable.  Another way of characterizing these premiums is "severance pay."  Mr. Hibbard did not testify as to the salaries of the employees, but stated that he spoke with a person who hires managers of similar facilities; the source reported that such management fees can run around $120,000.00 a year.[4]  Mr. Hibbard also referenced a letter from the Department of Health but indicated that the State of California requires at least 60 days' notice if a resident is going to be vacated.  Mr. Hibbard did not believe that the Golden Age residents could be vacated in as little as 60 days, but he stated that the cost to vacate would decrease if the time needed to move the residents decreased as well.

Testimony of Masha Levinson

Creditor offered Ms. Levinson's testimony to rebut Mr. Hibbard's $440,000.00 cost estimate to close Golden Age.

---

[4]The manner in which Mr. Hibbard mentioned this figure suggested that the managers charge these fees to close a facility.  A close reading of Exhibit 19 shows that these managers earn $120,000.00 a year as their salaries, not specifically for closing.

13

Ms. Levinson has been a Director on the Board of the Pacific Institute since 2008. She consults and manages some facilities that have patients with dementia and Alzheimer's disease, but she does not have experience with geriatric patients. She stated in general terms that she has experience with assisted care facilities. The Pacific Institute deals with mental health for the elderly and runs an internship program for psychology graduate students who work in residential care facilities. As a Director, Ms. Levinson's duties include deciding what is in the best interest of the Institute.

Ms. Levinson is also a member of Creditor, 523 Burlingame LLC, and paid $500,000.00 to purchase the original Note from Wells Fargo. She did not know at the time of purchase that the Note was being litigated; she did know, however, that Debtor was in bankruptcy. Ms. Levinson performed the due diligence on the Note herself; she does not have an accounting background.

Ms. Levinson testified to one experience that she had in shutting down a 90-bed residential care facility one and half to two years ago: Eden Manor in Oakland, California. Ms. Levinson reported that she assisted in shutting down the facility and transferring the operator's license from the previous owner, who was facing foreclosure, to a new owner, who intended to open a new facility. After the shut-down, the building, property, and nature of the business remained the same; the operator changed, and 90% of the residents were relocated. Ms. Levinson said that the foreclosure action made transfer of the residents an "emergency situation," and characterized the original owner-operator as having "abandoned the facility." Ms. Levinson was aware that the

14

State of California requires at least 60 days' notice to relocate a resident. She said that it took about 60 days to relocate Eden Manor's residents; however, some were relocated in as early as 30 days. The care of most of the residents in Eden Manor was State-funded; many had dementia. The buyer already had a license to run a residential care facility.

Ms. Levinson testified that this experience gave her an understanding of how the State assists operators who close their facilities. Ms. Levinson testified that while assisting in the shut-down of Eden Manor, the State of California and an ombudsman immediately arrived to the site to perform the relocation. She said that the State footed almost all of the costs except the cost of transporting the patients. According to Ms. Levinson, these latter costs are borne by the closing operator. Ms. Levinson said with regard to a hypothetical sale of a property like 523 Burlingame, it would be the operator/seller's responsibility to move the patients, not the buyer's, primarily because a buyer would have to have a license to operate before it could "set one foot" in the facility. Ms. Levinson intimated that because most buyers would not have such a license, the buyer would expect the seller to assume the responsibility. However, it was clear from Ms. Levinson's testimony that if the buyer intended to operate the Property as a residential care facility, the buyer would need a license to do so.

During Ms. Levinson's testimony, a separate issue arose concerning the differences between residential care facilities, which, as Ms. Levinson testified, are licensed by the Department of Social Services, and skilled nursing facilities, which are

Case: 11-59479   Doc# 568   Filed: 04/17/15   Entered: 04/17/15 15:09:30   Page 15 of
37

licensed by the Department of Health.  This was the first time in the hearing that the parties raised the issue of differences between residential care facilities and skilled nursing facilities.  Ms. Levinson said that Golden Age is a skilled nursing facility, while Eden Manor was a residential care facility, licensed by the Department of Social Services. Based on her conversations with the State during Eden Manor's closing, Ms. Levinson believed that the same rules for treatment of patients and closing procedures apply to both residential care facilities and skilled nursing facilities.  Ms. Levinson admitted that she is not a medical expert with regard to treatment and procedures required.[5]

Ms. Levinson patently disagreed that it would take nine months and $440,000.00 to close Golden Age.  She maintained that the State of California would offer assistance to any operator that closed voluntarily and that the operator's costs would be limited to the residents' transportation expenses and perhaps a small fee charged by the State for its services.

Ms. Levinson is also a licensed real estate broker and has been involved in sales that are similar to the Property.  She said that she represented a seller of a skilled nursing facility in Menlo Park, California.  Ms. Levinson did not provide any additional details about this transaction.  As a real estate broker, it is her belief that in a sale of a facility like Golden

---

[5]Although Mr. Aldana pressed Ms. Levinson about the differences between skilled nursing facilities and residential care facilities, Debtor and her expert repeatedly referred to Golden Age as a "residential care facility licensed by the Department of Health." As such, the preponderance of the evidence was that Golden Age is a residential care facility licensed by the Department of Health.

16

Age, there would be a contingency period in which the buyer would require the operator to clear the premises. Ms. Levinson said that it would be in the operator's financial interest to shut down a care facility as cheaply and quickly as possible.

<u>Testimony of David Frank Beccaria</u>

Creditor's expert, David Beccaria, graduated from Santa Clara University in 1997 with a bachelor's degree in finance. He received his MBA in real estate from Golden Gate University in 1981. He is a certified general appraiser, licensed in the State of California since 2003, and he is also a real estate broker licensed since 1979. After receiving his realtor's license, he worked for his family's company, Wellington, and later became CEO of his own company, Beccaria and Webber, in Capitola, California. He is the chief appraiser for his company. The company also performs brokerage and asset and property management services. Mr. Beccaria's principal function is performing residential and commercial appraisals and managing his company.

Mr. Beccaria is familiar with the Property's neighborhood. He testified that all of the properties on Burlingame Avenue are single family residences. Most of the buildings on Capitola Avenue are also residences, although some are small businesses. Mr. Beccaria stated that he is familiar with at least three residential sales since March 2014 in the Property's neighborhood. He did not know the prices of all of the sales, but remembered one in particular, which sold for $1,050,000.00 to Dwight Clark, a former wide receiver for the San Francisco 49ers.

Mr. Beccaria preferred not to use the Income Capitalization Approach. Mr. Beccaria stated that he did not have access to

17

Golden Age's financial statements, thus making the Income
Capitalization Approach unfeasible. Mr. Beccaria did not feel that
the Income Capitalization Approach was appropriate because he
noticed from sales of "other care facilities of differing types"
that the "existing use"[6] of those care facilities "did not survive
the sale." Mr. Beccaria stated that he could not find a sale of a
property in the last five years where the existing care facility's
specific business operation continued.  The recent comparables
that Mr. Beccaria researched indicated that the residential care
facility business operation ceased and was converted to a
different, but sometimes very similar, operation.  Based on this,
Mr. Beccaria felt that the fair market value would focus on an
alternative uses for the Property and as such, applied the Sales
Comparison Approach.

Mr. Beccaria applied the Sales Comparison Approach using two
different methods of valuation: #1, Market Value of the Property
"As If" Vacant, and #2, Market Value of the Property "As
Improved." In applying both valuations, Mr. Beccaria arrived at
almost identical fair market values for the Property:
$1,890,000.00 and $1,888,785.00, respectively.

For the "As If" Vacant approach, Mr. Beccaria produced six
"comparable" properties. Each of the comparables were similar to
the Property in that they had buildings and/or structures which
ultimately needed to be demolished and/or removed, and were
located on single assessor's parcels which were divided into
residential lots. Mr. Beccaria chose these comparables based on

---

[6]These "existing uses" are described in more detail, _infra_.  They
include, for example: convalescent homes, residential care facilities,
and assisted living facilities.

their proximity to the Village of Capitola. During the trial, both Mr. Hibbard and Mr. Beccaria stated that the Village of Capitola was the area in the City of Capitola that is close to the wharf and seaside. Properties in this vicinity are very desirable. All of the "As If" Vacant comparables and the Property are located in the "Depot Hill" area of Capitola; the comparables are no more than half a mile away from the Property "as the crow flies." Mr. Beccaria applied "negative time adjustments" to all the comparables, which he believed sold during a time period when the median income sales price was higher than the prevailing median sales price on the date for setting valuation in this case, December 2013. Four of the comparables were located in Capitola, and the other two were located in Santa Cruz. None of the comparables had a history of residential care operations.

Comparable #1, 515 Burlingame Avenue, Capitola, California, is an 8000 square-foot lot which was divided into two 4000 square-foot lots. Mr. Beccaria is particularly familiar with this property because it was once owned by one of his clients. Comparable #1 had one large house on two legal lots. The owner vacated the premises and sold the house and parcel to a developer. The developer "re-established" Comparable #1's single parcel into two legal lots by surveying the lots, developing a plan, submitting the plan to the City, and waiting three to four months for approval. After receiving approval, the developer demolished the house, built a residence on each legal lot, and sold residences at a sizable profit. Mr. Beccaria estimated the price per square foot of the vacant land to be $122.75. A developer paid $492,250.00 for each lot, and later sold two houses (one built on

19

each lot) for $1,250,000.00 and $1,175,000.00 each. Comparable #1 is located three houses down from the Property.

Mr. Beccaria believed Comparable #2, 203 & 205 Sacramento Street, Capitola, California to be the most similar to the Property. Comparable #2 consisted of two legal lots, each 4000 square feet, and prior to the sale, had two mobile homes on a use permit basis. Comparable #2's parcel sold in August 2011. The mobile homes were removed after close of escrow and two new homes were built and sold in September and December 2013. Mr. Beccaria estimated the price per square foot of the vacant land to be $116.72. A developer paid $466,875.00 for each lot and the houses that were later built on the lots sold for $1,445,000.00 and $1,375,000.00 each.

Comparables #3 through #6 were also sold as vacant lots. All of the lots remained vacant as of March 2014, although Mr. Beccaria noted that construction may be starting on Comparable #3 because he saw a porta-potty on #3 in March 2014, a sign of early-stage construction. The lots sold at a price of $83, $98, $100, and $118 per square foot, respectively.

Considering the Property as four separate lots, each capable of residential development, Mr. Beccaria used the median and mean prices per square foot of the comparable properties to generate an estimated price per square foot of the Property's four legal lots. Mr. Beccaria applied a value of $120 per square foot to the first lot (4000 square feet, on Burlingame Avenue) for a total value of $480,000.00; $110 per square foot to the second lot (6000 square feet, on Burlingame Avenue) for another $660,000.00; $100 per square foot to the properties on Capitola Avenue (each 4000 square

20

feet) (using a lesser amount for these properties because Capitola
Avenue is noisier than Burlingame Avenue) for another $800,000.00,
and subtracted $50,000.00 for demolition. Mr. Beccaria did not
account for the cost to empty a care facility in the calculation.
The combined value of all four lots yielded a $1,890,000.00 market
value for the Property under the "As If" Vacant Sales Comparison
Approach.

Applying the "As Improved" Sale Comparison Approach, Mr.
Beccaria used four comparable properties. All of the comparables
were located in Santa Cruz, which is a different area. Before the
comparable properties were sold, each ran businesses similar to
Golden Age. For two of the comparables, the new owner adopted the
same type of business as the previous owner, an assisted living
center. However, the new owner ran the new business with a
completely new license and obtained new residents. Mr. Beccaria
believes that three of the four "As Improved" comparables sold
vacant. Mr. Beccaria did not investigate what happened to the
original residents or how much it cost the buyer or the seller to
vacate the premises. He did not say how many residents stayed and
how many left, or how long it took to relocate the residents.
From these properties, Mr. Beccaria made adjustments to the price
per square foot based on each comparable's location to the
Property's location – in other words, whether the comparable's
neighborhood was more or less desirable.

Comparable #1, 831 Paget Avenue, Santa Cruz, California was a
convalescent home at the time of sale. It now operates as a 10-
bed substance abuse recovery center, "Providence Recovery Center."

21

Mr. Beccaria estimated the price per square foot of Comparable #1's building to be $228.55.

Comparable #2, 1906 Glen Canyon Road, Santa Cruz, California was used as a residential care facility for Alzheimer's patients before its sale. It now operates as a Buddhist meditation center, "Insight Meditation Center in Mid Peninsula." The building's price per square foot is estimated to be $248.52.

Comparables #3 and #4, 2000 Brommer Street and 777 Volz Lane, both in Santa Cruz, were each operated as assisted living centers before and after the sale, although there were substantial changes made during the change in ownership. At Comparable #3, 2000 Brommer, a new operator took over the facility. The premises were remodeled, increasing the number of beds from 36 to 40. The building still operated as an assisted living center, but many of the residents left during the sale and remodeling. Mr. Beccaria estimated the price per square foot of the Brommer building to be $250.25. Comparable #4 was also an assisted living center: "Santa Cruz Clean & Sober Homes." The buyers opened another residential care facility in the building, and all of the former residents of Clean & Sober's operation were relocated.

Mr. Beccaria used the median of the price per square foot values of the comparables' buildings to arrive at a mean value of $255 per square foot. Mr. Beccaria applied this price to the Property's 15-room, 7,496 square foot building to determine that the value of the Property is $1,888,785.00.

Mr. Beccaria did not believe that Wells Fargo's sale of the Note on the Property to Creditor affected the fair market value analysis. Mr. Beccaria testified that Wells Fargo sold the Note,

Case: 11-59479   Doc# 568   Filed: 04/17/15   Entered: 04/17/15 15:09:30   Page 22 of 37

originally worth around $1.8 million, to Creditor for $500,000.00.
Mr. Beccaria believes that the sale is an indication of
liquidation value.  Mr. Beccaria stated that, in general, REO
sales and bank sales are not evidence of market value unless the
market is "saturated" with these kinds of sales, and Capitola is
not a market that is saturated with foreclosure sales.  Mr.
Beccaria speculated that he believed Wells Fargo may have chosen
not to foreclose on the Property because the bank is not a
property owner and is not in the practice of conducting such
transactions.  Mr. Beccaria stated that if Wells Fargo had
consulted with him, he would have advised the bank not to
foreclose on the Property for $500,000.00.[7]

Mr. Beccaria did not believe that the Golden Age residents
were a "toxic condition" on the Property.  Mr. Beccaria believes
that the seller would be responsible for vacating the premises
during an escrow period of three to six months in which a buyer
performs due diligence.  Mr. Beccaria stated that if there were a
cost to move the Golden Age residents, this cost would simply be
deducted from the fair market value of the Property.

## III. Conclusions of Law

Debtor has asked the Court to assign a value to the Property
in accordance with § 506(a)(1).  The statute provides in relevant
part:

---

[7]Wells Fargo, in this Court's experience, regularly seeks relief
from stay to foreclose on real properties. However, the subject
Property is filled with elderly and mentally ill people, and Wells
Fargo may not have wanted to foreclose on it. In any event, the Court
places no reliance on this $500,000.00 sale in reaching its decision
on this matter.

23

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . . Such value shall be determined in light of the purpose of valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on disposition or use or on a plan affecting such creditor's interest.

Debtor initially bears the burden of overcoming the presumption that the value of the property stated in Creditor's proof of claim is the correct value. See In re Postolica, 2012 WL 1035900, at *5 (Bankr. N.D. Cal. Mar. 27, 2012) (citing In re Southmark Storage Associates Ltd. P'ship, 130 B.R. 9, 10 (Bankr. D. Conn. 1991)). After Debtor meets her burden, the burden shifts to Creditor to show the value of the property by a preponderance of the evidence. Id.

Here, Creditor's Proof of Claim states that the value of the Property is $1,829,167.73. Debtor has rebutted this presumption by presenting evidence that the Property has a much lower value, particularly because there is a residential care facility operating on the premises whose residents would need to be moved. Indeed, Mr. Beccaria suggested that the seller of Property would cause the residents to be removed before the buyer completed his or her due diligence. Thus, it is Creditor's burden to persuade the Court that the Property should be given a higher value.

Valuation under § 506(a) is a multi-step process. § 506(a)(1); see also Associates Commercial Corp. v. Rash, 520 U.S. 953, 960-62 (1997). First, the Court must determine the estate's interest in the Property. Id. Second, the Court must determine Creditor's interest in the estate's interest. Id. Finally, the Court must select a proper valuation standard which

Case: 11-59479   Doc# 568   Filed: 04/17/15   Entered: 04/17/15 15:09:30   Page 24 of 37

contains two additional steps: identifying a) the purpose of valuation, and b) proposed disposition or use of the collateral-property.  Id.

### a) The Estate's Interest in the Property

Debtor has not presented evidence that she has less than full ownership of the Property.  Thus, the Court will accept that the estate has full ownership on the Property.

### b) The Extent of Creditor's Interest in the Estate

Second, the Court must access what interest Creditor has in the estate's interest in the Property. § 506(a)(1); see also Rash, 520 U.S. at 961.  Creditor's lien can only be treated as secured to the extent that Creditor has a legal interest in the estate's interest.  Id.  If there are liens senior to Creditor's, the amount of debt secured by the senior lien(s) must be deducted in determining the extent to which Creditor, as junior lien holder, holds an interest in the estate's interest in the Property. Frazier v. Real Time Solutions, Inc., 469 B.R. 889, 896 (E.D. Cal. 2012); see also In re Moellenbeck, 83 B.R. 630, 632 (Bankr. S.D. Iowa 1988).

Here, the Claims Register shows that the County of Santa Cruz Tax Collector has a secured claim in the amount of $100,060.32 as of the petition date for unpaid property taxes. The lien amount may have increased if property taxes have not been kept current post-petition, but the Court has no evidence before it to suggest whether this is the case. The County did not indicate on its Proof of Claim that its Claim is entitled to priority under § 507(a). Nevertheless, under state law the County's claim is secured and is in first position ahead of Creditor.  The delinquent property

25

taxes become a lien against the Property and have priority over all other liens regardless of the time of their creation. Cal. Rev. & Tax. Code §§ 2187, 2192.1. Creditor's lien is thus junior to the County's. The County's claim amount, $100,060.32, will be deducted from Creditor's secured claim in the Property, $1,148,785.00, leaving Creditor's remaining interest in the estate's interest in the Property at $1,048,724.68. This amount may further decrease if more unpaid property taxes have accrued since the County filed its claim.

### c) The Appropriate Method of Valuation

#### i. The Purpose of the Valuation

The purpose of the valuation in this case is to determine to what extent Creditor's lien is secured by the Property.

#### ii. Proposed Disposition or Use of the Property

The Supreme Court's opinion in <u>Rash</u> is the governing law for valuation of collateral under § 506(a). The Court explained that when making a valuation determination under § 506(a), "the 'proposed disposition or use' of the collateral is of paramount importance . . . ." <u>Rash</u>, 520 U.S. at 962 (quoting § 506(a)).

Here, Debtor's proposed use of the Property is its actual use as a residential care facility for the elderly and mentally ill and/or impaired. Debtor's Plan includes the Property as an investment property. Income from Debtor's investment properties is included in the income that will fund the Plan.

#### iii. The Appropriate Method of Valuation

The <u>Rash</u> Court held that the appropriate method of valuation must consider the fair market value of the subject property, which is: "the price which a willing buyer in the debtor's trade,

26

business, or situation would pay to obtain like property from a willing seller." Rash, 520 U.S. at 960; see also In re Taffi, 96 F.3d 1190, 1192 (9th Cir. 1996) ("[T]he price which a willing seller under no compulsion to sell and a willing buyer under no compulsion to buy would agree upon after the property has been exposed to the market for a reasonable time.").

A court may arrive at the fair market value by considering a hypothetical transaction in which the property is sold as a going concern. In re Helionetics, Inc., 70 B.R. 433, 439-40 (Bankr. C.D. Cal. 1987); see also 4 Collier on Bankruptcy ¶ 506.03[6][c] (Alan Resnick & Henry Sommer eds. 16th ed. 2014). Where a debtor intends to retain the property, costs of sale are not considered because the property is not being sold. Taffi, 96 F.3d at 1192.

Often parties will present a number of comparable properties during an evidentiary hearing to help the court define the subject property's "relevant market." See In re De Leon, 2013 WL 3805733, at *4-7 (Bankr. N.D. Cal. July 18, 2013). The valuation should also take into account unique aspects of the subject property which a buyer might find attractive. See In re Lewis and Clark Apartments, LP, 479 B.R. 47, 53 (B.A.P. 8th Cir. 2012). The court should also consider the age, condition, and location of the subject property. See In re Methvin, 11 B.R. 556, 557 (Bankr. S.D. Miss. 1981), aff'd, 31 B.R. 569 (S.D. Miss. 1982); see also 4 Collier on Bankruptcy ¶ 506.03[6][c] (Alan Resnick & Henry Sommer eds. 16th ed. 2014).

Debtor argues that the Court should apply the Income Capitalization approach. Under this Approach, Mr. Hibbard envisioned that the Property would continue in its existing use

27

but undergo a number of changes to increase Golden Age's cash flows. After applying the "Abstraction Method" to Golden Age's improved cash flows, Mr. Hibbard believed that the Property was worth $960,000.00. Mr. Hibbard rejected the Land Sales Comparison Approach because he believed that the cost to relocate the residents, $440,000.00, would ward off any potential buyers.

Despite the thoroughness of Mr. Hibbard's report, some of his testimony is unpersuasive. First, Mr. Hibbard's "Income Capitalization Approach," which by definition uses "gross potential rental income," did not take into account that Golden Age actually pays Debtor a rental fee of $14,000.00 a month. Mr. Hibbard intimated that he did not use the rental fee because Debtor, the lessor, is the owner of Golden Age, the lessee. Nonetheless, Mr. Hibbard did not sufficiently explain why he omitted this figure from his report. Second, Mr. Hibbard provided conflicting testimony with regard to the appropriate method of valuation. Mr. Hibbard heavily relied on the Abstraction Method in his Income Capitalization Approach, but at one point suggested that the Abstraction Method did not yield market value.

Finally, Mr. Hibbard also stated that he relied on the Income Capitalization Approach because there were no comparable sales data for vacated care facilities. Mr. Beccaria, on the other hand, produced six comparables, all of which were operated as elderly care facilities (although of different types) before they were vacated, sold, and converted to different or similar kinds of operations and/or ownership.

Creditor believes that the Court should apply the Sales Comparison Approach. The Court rejects Mr. Beccaria's first Sales

Case: 11-59479    Doc# 568    Filed: 04/17/15    Entered: 04/17/15 15:09:30    Page 28 of 37

Comparison Approach which valued the property "As If" Vacant.[8] Imagining a sale of the Property as a vacant parcel, capable of being subdivided into residential lots, is not consistent with Debtor's proposed actual use of the Property as a residential care facility. Rash cautioned courts not to consider "various dispositions or uses that might have been proposed." Rash, 520 U.S. at 964. The "As If" Vacant valuation is also not consistent with the Ninth Circuit's method for valuation: determining the price to be paid by a willing buyer upon some form of hypothetical purchase of the property. See Taffi, 96 F.3d at 1192. If Debtor were in the market to buy a similar property to run Golden Age, it is likely that she would consider properties that were already improved.

Mr. Beccaria's second Sales Comparison Approach analysis for "As If" Improved, however, falls closer in line with Rash and Taffi because it shows transactions that include buyers who have similar motives to Debtor: each of the comparable properties were purchased with the intention of preserving the properties' existing structures and using the properties to run income-generating businesses that house numerous residents. Comparables #3 and #4, 2000 Brommer Street and 777 Volz Lane, are particularly persuasive to the Court because they were both purchased by individuals who intended to run an assisted living center, an operation that this Court understands to be, while not the same as Debtor's business, a somewhat similar one.

---

[8]The "As If" Vacant Approach considered the Property as though the 7,496 square foot building was demolished and the single assessor's parcel was subdivided into four separate lots capable of residential redevelopment.

Case: 11-59479    Doc# 568    Filed: 04/17/15    Entered: 04/17/15 15:09:30    Page 29 of 37

Moreover, Mr. Beccaria's "As Improved" valuation employed a more scientific method which accounted for factors discussed in § 506(a)'s jurisprudence. Mr. Beccaria applied adjustments in value to all of his comparables to account for differences between the comparables and the Property, particularly with regard to the demand in the market between the time frame for this valuation, December 2013, and the comparables' sales dates. Mr. Beccaria also made adjustments for the comparables' location which may have been less desirable than the Property because they were not located near the Village of Capitola.

Mr. Beccaria's "As Improved" valuation is missing two very important adjustments: (1) the cost to shut down Golden Age; and (2) the cost to renovate the existing Property such that it could be capable of running a profitable business.

Mr. Beccaria admitted that his valuation does not account for the cost to shut down Golden Age, which principally includes the cost of relocating the residents. While he was aware that there were residents inhabiting the "As Improved" comparable properties prior to sale, he did not investigate what happened to the original residents or how the cost of their relocation affected the sales prices of the comparable properties. Mr. Beccaria only knew that three of the four comparables sold vacant. Mr. Beccaria opined that the seller would be responsible for vacating the premises during the escrow period of three to six months, but that appeared to be more speculation than anything else.

The Court has relatively little evidence on the cost to shut down Golden Age and make it vacant for sale. Mr. Hibbard, relying on a CPA's report, testified that it would cost $440,000.00 to

30

relocate Golden Age's 26 residents and shut it down.  Mr. Beccaria
did not give any estimate of the cost to remove the residents, but
stated that if he knew the amount, that amount would simply be
deducted from his valuation (*i.e.*, if the cost was in fact,
$440,000.00, the value of the Property would be $1,888,785.00[9] -
$440,000.00, for a value of $1,448,785.00).

Creditor offered the testimony of Masha Levinson to rebut
Mr. Hibbard's estimate.  The Court gives her testimony very little
weight because she had only a one-time experience in shutting down
a facility in an "emergency situation."  The facility, Eden Manor,
was distinguishable from Golden Age in a number of ways.  Eden
Manor was located in Oakland and was licensed by the Department of
Social Services, not the Department of Health.  The previous
operator did not shut down the facility voluntarily.  Indeed, in
many instances, Ms. Levinson described the operator as having
"abandoned" the facility.

On the record provided, the Court finds that Creditor did not
meet its burden in proving that the cost to shut down Golden Age
is less than $440,000.00.  As Debtor's Trial Brief pointed out,
Creditor had ample time to conduct discovery and read
Mr. Hibbard's report.  For whatever reason, Creditor chose to rest
its case almost entirely on Mr. Beccaria's testimony, who admitted
that he did not factor the cost of shut-down into his report, and
Ms. Levinson, a party-in-interest with a very different, one-time
experience.  For these reasons, the Court accepts Mr. Hibbard's

---

[9]This was Mr. Beccaria's valuation of the Properties under the
"As Improved" Sales Comparison Approach.

Case: 11-59479    Doc# 568    Filed: 04/17/15    Entered: 04/17/15 15:09:30    Page 31 of
37

estimate that it would cost $440,000.00 to make the Property vacant before it could be sold.

A few points in Mr. Hibbard's and Masha Levinson's testimony laid the foundation for Mr. Hibbard's $440,000.00 cost estimate and assure the Court that the estimate is not a speculative one. First, Mr. Hibbard testified that care facility managers typically charge $120,000.00 per year to manage a facility, and that the manager and remaining employees would require severance pay to stay on board during the shut-down process. Second, the process is subject to State oversight, which requires, for example, giving at least 60 days' notice to the residents before they are relocated. Such oversight ensures that some degree of knowledge and expertise is required to initiate the closure; as Ms. Levinson testified, persons entering the facility during the shut-down must have a license to be on the premises. Third, the operator would have to pay the cost of the residents' transportation to new facilities. Fourth, Mr. Hibbard testified that Golden Age's patients were very ill and had poor funding sources, making them difficult to relocate. Finally, the facility may incur additional costs such as paying damages on existing contracts that must be terminated.

Once the Property is vacated, the Court must consider the cost that would be required to make the Property attractive to potential buyers. Alternatively, the sales price would have to be reduced to account for this substantial cost. Mr. Beccaria stated that the Property's current use, as an unprofitable residential care facility, is not the "highest and best use" of the Property. While the plain language of § 506(a) requires the Court to

consider Debtor's "actual, proposed use" of the Property rather than "highest and best use,"[10] § 506(a)'s jurisprudence also requires the Court to consider the fair market value in which the Property is sold as a going concern in a relevant market. See Helionetics, 70 B.R. at 439-40. In other words, there must be some potentially profitable use for the Property, otherwise there would be a dearth of "willing buyers" in the market and the Property might be subject to a price that is closer to liquidation value.

Such is the case here. Mr. Beccaria testified that there were a limited number of buyers for residential care facility businesses, or buildings that could be operated as residential care facilities. This is perhaps due in part to the challenge of caring for sick and elderly patients and the burdensome licensing requirements which Mr. Levinson and Mr. Hibbard described. Indeed, for two of the four "As Improved" Comparables, the buyers did not take over the existing business or start their own residential care facilities. Rather, the existing structures were converted to different businesses (the first, a Buddhist meditation center and the second, a substance abuse recovery

[10]Both Creditor and Debtor considered the "highest and best use" of the Property, but neither party explained whether "highest and best use" is the correct test in light of the plain language in § 506(a) which requires the Court to consider actual, proposed use. Courts are split as to whether fair market value should be determined in light of the "highest and best use" of the property when the "highest and best use" is different from debtor's actual, proposed use. See In re Old Colony, LLC, 476 B.R. 1, 15 n.17 (Bankr. D. Mass. 2012). The Ninth Circuit has yet to weigh in on the debate directly. See In re Arnold and Baker Farms, 177 B.R. 648, 655-56 (B.A.P. 9th Cir. 1994), aff'd, 85 F.3d 1415 (1996); see also In re Standley, 2012 WL 6091267, at *10-11 (Bankr. D. Mont. Dec. 2, 2012) (Debtor and creditor debated whether court should adopt creditor's "highest and best use" valuation or debtor's proposed, actual use, but court found that creditor's highest and best use valuation was actually consistent with debtor's proposed, actual use.).

33

center). While Comparables #3 and #4, 2000 Brommer Street and 777 Volz Lane, are persuasive because they were both purchased by buyers who intended to run businesses similar to Debtor's (assisted living centers), those buyers paid for a number of renovations to "As Improved" Comparables #3 and #4 before opening what they apparently hoped would be profitable businesses.

Mr. Beccaria described the renovations to Comparables #3 and #4 in detail, stating that the buyers changed the number of beds in the facility, remodeled the premises, and relocated some if not all of the residents. Mr. Beccaria did not describe the cost associated with the renovations, and counsel for both parties did not question Mr. Beccaria about the cost to renovate Comparables #3 and #4. However, it is clear that because some cost was incurred to make Comparables #3 and #4 profitable, some cost must also be attributed to the Property to make it profitable as well. Only then can the Property be evaluated as a "going concern" in the relevant market.

Mr. Hibbard offered some testimony on the cost to renovate the Property to make it profitable. Like the transformation at Mr. Beccaria's "As Improved" Comparables #3 and #4, Mr. Hibbard stated that the Property similarly required substantial changes which included: reducing the number of beds from 40 to 30 or 32; eliminating expensive nursing staff; remodeling the premises; and, changing the type of residents (from very ill State-funded patients to less ill, privately-funded patients). Mr. Hibbard's report further described: "[T]he property does not generate sufficient income to provide for the periodic refurbished [sic] of the physical facility. The result is the property now reflects

34

significant deferred maintenance, which threatens its continued operation." Mr. Hibbard found that after implementing these changes, "the facility will become competitive with other comparable properties in terms of its condition room sizes [sic]." Mr. Hibbard estimated that these renovations would cost around $450,000.00. Unlike the cost to vacate the Property, the Court assumes that if these renovations were to take place, they would be paid for by a potential buyer of the Property and not Debtor because the record reflects that Debtor does not have the funds to foot the costs. Thus, a buyer seeking to purchase the Property and its vacant building for purposes of running a residential care facility would likely negotiate for a reduction in the sale price knowing that he or she would have to pay for substantial renovations before he or she could open for business. Creditor did not rebut Mr. Hibbard's testimony that these renovations would cost $450,000.00. As such, the Court accepts that out of Mr. Hibbard's $450,000.00 estimate, it would cost $300,000.00 to renovate the Property so that it could "become competitive with other comparable properties." The Court declines to accept the entire $450,000.000 estimate because some of costs in Mr. Hibbard's proposal overlap with the cost to make the Property vacant, such as eliminating staff and relocating the very ill, State-funded residents.

In sum, the Court accepts Mr. Beccaria's "As Improved" fair market value of the Property of $1,888,785.00. From this amount, the Court deducts $440,000.00 to make the Property vacant and

Case: 11-59479    Doc# 568    Filed: 04/17/15    Entered: 04/17/15 15:09:30    Page 35 of
37

ready-for-sale[11] and an additional $300,000.00 in renovation costs to bring the Property up to par with other comparable properties which are used for businesses similar to Debtor's. Thus, the Court finds that the final fair market value of the Property is $1,148,785.00 as of December 2013.

**\*\*\* END OF MEMORANDUM DECISION \*\*\***

---

[11]As discussed above, Mr. Beccaria conceded that if he knew the cost to shut down Golden Age, these costs would simply be deducted from his fair market value estimate.

36

1                              COURT SERVICE LIST
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Case: 11-59479    Doc# 568    Filed: 04/17/15    Entered: 04/17/15 15:09:30    Page 37 of 37