The following constitutes
the order of the court. Signed November 5, 2015

**Charles Novack**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re:

ESTERLITA CORTES TAPANG,

    Debtor.

Case No. 11-59479 CN
Chapter 11

Date: July 7, 2015
Time: 9:30 a.m.

### MEMORANDUM DECISION RE: INTEREST RATE[1]

In this Chapter 11 case, the Court has been asked to determine whether to cram down the interest rate on a loan pertaining to real property located at 523 Burlingame Avenue in Capitola, California (the "Property"). At trial, Esterlita Cortes Tapang ("Debtor") was represented by Francisco Aldana, and Creditor 523 Burlingame LLC ("Creditor") was represented by David Wiseblood.[2] The parties have asked the Court to determine this issue for plan confirmation purposes. This decision determines that the interest rate on Creditor's secured claim for plan confirmation purposes is 5%.

---

[1] This case was originally assigned to Judge Arthur Weissbrodt. After Judge Weissbrodt announced his retirement, the case was reassigned to Judge Novack, but the interest rate issue was reserved to Judge Weissbrodt. A trial on the interest rate issue took place before Judge Weissbrodt on July 7, 2015, and the matter came under submission. On October 30, 2015, this remaining issue was reassigned to Judge Novack, who has reviewed the record and testimony.

[2] On September 15, 2015, Matthew Shier substituted into the case and replaced David Wiseblood as Creditor's counsel.

Debtor's counsel had advised the Court multiple times that Debtor intended to file a fourth amended plan and disclosure statement once the Court issued a ruling on the cram down interest rate. Instead, Debtor filed a fourth amended plan and disclosure statement on October 27, 2015. The fourth amended plan provides for an interest rate of 4.25% on Creditor's loan. Such interest rate is different from the rate Debtor proffered at trial.

Debtor contended at trial that a fixed interest rate of 5%, which consists of a 3.25% prime rate and a 1.75% risk premium, is appropriate and in accordance with the Supreme Court's decision in Till v. SCS Credit Corporation, 541 U.S. 465 (2004). Creditor argued that an interest rate of 5% does not properly account for the risk factors present in this case.

In a decision issued on December 17, 2014, after briefing by the parties, Judge Weissbrodt ruled that while Debtor bears the overall burden of proof to show that the confirmation requirements of 11 U.S.C. § 1129 are met, Creditor bears the burden of proof on the appropriate risk factors to be applied under the formula approach set forth in Till. Nevertheless, Creditor presented no witnesses or independent evidence of its own on the appropriate risk factors or how those factors should be assessed in this case.[3] Creditor also has not proposed or otherwise advocated for any specific interest rate. In fact, Creditor's trial brief is silent as to what Creditor thinks the rate should be. Creditor's trial brief mentions that the contract rate of interest was 7.213% and variable when the note was signed on November 24, 2004. The promissory note, itself, is attached to Creditor's proof of claim; the note shows that this 7.213% interest rate was based upon a prime rate of 5% plus 2.213%. Creditor has not stated what the contract rate would be now in light of the lower prime interest rate, and Creditor has not argued that 7.213% is an appropriate rate in light of current market conditions. Instead, Creditor simply asserts that a 5% rate is insufficient. Interestingly, Creditor's proof of claim states that the annual interest rate as of the petition date was 4.25%.

---

[3] On March 14, 2014, Creditor designated Terrence Daly as an expert to testify on the Till issue. However, at a hearing held on September 24, 2014, Creditor disclosed that Daly had left the industry. Creditor did not designate anyone else to testify as an expert and instead elected to rely exclusively on the cross-examination of Debtor's expert.

For the reasons explained below, the Court finds that a 5% interest rate, consisting of a 3.25% prime rate plus a 1.75% risk premium, is appropriate for the loan on the Property for plan purposes and sufficiently compensates Creditor for any risks present.

**I.      Findings of Fact**

Creditor is the holder of a claim totaling $1,829,167.73, and has a secured interest in the Property. This claim is junior only to the County of Santa Cruz's claim for delinquent property taxes in the amount of $100,060.32. On April 17, 2015, Judge Weissbrodt issued a written decision finding that the fair market value of the Property, limited to the real property with its improvements but without the business, is $1,148,785.00. As a result, only $1,048,724.68 of Creditor's claim is secured, and the remaining $780,443.05 is unsecured. Creditor purchased the Note for the Property for $500,000.00, but the Court has given no weight to this fact in this decision.

Because Debtor has asked the Court to cram down the interest rate on Creditor's loan, a trial was held. The only witness was Debtor's expert, Phillip Gillet, who opined that the appropriate interest rate for a loan on the Property would be 5%. Before trial, Creditor opposed Gillet's qualifications by filing a motion in limine, but Judge Weissbrodt issued a written ruling denying the motion on October 30, 2014, finding that Gillet was qualified to testify. At trial, the parties stipulated to Gillet's qualifications based upon the Court's written ruling.

Gillet obtained a Bachelor of Arts in economics and a Bachelor of Science in business administration from California State University, Bakersfield, in 1998. Gillet also obtained a Juris Doctor from California Western School of Law in 2000 and is currently enrolled in a Master of Laws program with a concentration in bankruptcy and restructuring at Thomas Jefferson School of Law. In addition, Gillet taught an accounting course as a full-time graduate teaching associate at San Diego State University from January 2000 to December 2000, and also taught an accounting and business law course as an adjunct professor at San Diego City College from January 2001 to December 2001. Gillet was admitted to practice law in November 2001, and is also admitted to practice in bankruptcy courts for the Eastern, Central, and Southern Districts of California, as well as the United States Tax Court. Gillet has held a California real estate broker license since December 2, 2014, was board certified in consumer bankruptcy law by the American Board of Certification in

June 2012, and has been certified by the State Bar of California's Board of Legal Specialization as a bankruptcy specialist since June 2012.

Gillet began his testimony by identifying the scope of his engagement: calculating the appropriate rate of interest on the loan for the Property. As a real estate broker, Gillet keeps himself apprised of interest rates in his business at all times. Gillet testified that in general, to calculate the appropriate rate of interest for secured debt in a reorganization plan, he consults the Wall Street Journal to find the current prime interest rate and then considers risk factors enumerated in Till for an upwards risk adjustment. Gillet testified that for this case, with a prime interest rate of 3.25% and an upwards risk adjustment of 1.75%, a 5% interest rate is appropriate.

Gillet consulted the Wall Street Journal to obtain the prime interest rate as of the date of the bankruptcy filing. That rate was 3.25%. Gillet testified that the current prime interest rate remains unchanged at 3.25%, a fact which Creditor does not contest.[4]

Gillet also testified concerning whether the passage of time had any impact on the accuracy of his report, which he completed in 2014. Gillet testified that there are no significant changes that he would make to his report. In addition to the fact that the prime rate remains unchanged, Gillet stated that none of the risk factors have changed, and he still believes that a 5% interest rate is appropriate.

In his calculation of the 1.75% upwards risk adjustment, Gillet testified that he considered a number of factors in their totality. Gillet testified that the most relevant factor he considered in this case was the treatment of similarly situated creditors in the reorganization. Gillet stated that in his review of the Debtor's third amended Chapter 11 plan,[5] he observed that the other secured creditors holding first deeds of trust on various real properties have all stipulated to an interest rate of 5% or less. The secured creditors who entered into such stipulations are: the Bank of New York Mellon, which entered into two different stipulations on May 30, 2014, and on June 24, 2015 for a 4.5%

---

[4] Creditor has provided no evidence that interest rates have increased since Gillet prepared his report.

[5] Gillet did not review the fourth amended plan, which was filed after trial.

interest rate on two separate loans;[6] Deutsche Bank National Trust Company, which entered into a stipulation on May 29, 2014 for a 4.5% interest rate; United States Bank National Association, which entered into a stipulation on May 30, 2014 for a 5% interest rate; and Wells Fargo, which entered into a stipulation on January 27, 2014 for a 4% interest rate.[7]

In addition, Gillet testified that in his risk analysis, he considered the timeliness of Debtor's monthly plan payments of $6,115.93 on the Property, the fact that Debtor is current in monthly post-petition property tax payments of $4,488.84 on the Property, and the existence of a cash cushion of more than $200,000.00 in Debtor's checking account.

Gillet testified that his analysis of the abovementioned risk factors was completed after reviewing the following documents: the third amended combined plan of reorganization and disclosure statement; the Chapter 11 monthly operating report for May 2015; the Wall Street Journal for the current prime interest rate; and the appraisal report completed by John W. Hibbard. Gillet's analysis and review of pertinent documents is also outlined in an expert witness report which he completed on May 30, 2014. Consistent with his testimony, Gillet's expert witness report states that the appropriate interest rate on Creditor's loan is 5%, consisting of a 3.25% prime rate of interest and a 1.75% default premium rate of interest.

Debtor's third amended plan of reorganization, which Gillet reviewed and considered, identifies all of Debtor's known creditors and describes how each claim is to be treated under the proposed third amended plan. The third amended plan identifies ten claims made by secured creditors. Of these ten claims, six claims were made by secured creditors holding a First Deed of Trust on various properties, including Creditor's claim. The third amended plan provides that the

---

[6] The earlier of the two stipulations provided for a 2% interest rate for the first three years as to one of the loans.

[7] The interest rates for these secured creditors remain equal to or less than 5%.

other five first-position secured creditors will be paid at interest rates of 5% or less, in accordance with their stipulations, discussed supra.[8]

Debtor's May 2015 monthly operating report, which Gillet also reviewed and considered, includes a balance sheet and a statement of cash receipts and disbursements. Debtor's balance sheet as of May 31, 2015 indicates that she is not post-petition delinquent on adequate protection or tax payments for the Property. In addition, Debtor's statement of cash receipts and disbursements indicates that at the end of May 2015, Debtor had a cash balance in the approximate amount of $200,754.00.[9]

At trial, Creditor did not present any witnesses, although given a full opportunity to do so. Instead, Creditor cross-examined Gillet about various risk factors.

Gillet agreed with Creditor's counsel that the following risk factors were relevant in this case: the age of the Property, any necessary maintenance and/or repairs; the nature of the collateral; the duration of the proposed reorganization plan; Debtor's pre-petition performance, including the pre-petition arrearages in the amount of $45,992.44; Debtor's post-petition arrearages in the amount of $131,843.80; and the loan-to-value ratio to the lender. Gillet also agreed that the $200,754.00 cash cushion listed in Debtor's statement of cash receipts and disbursements for May 2015 is not free, unencumbered cash, and that according to the third amended plan, Debtor's administrative expenses to be paid over four years total $350,000.00. Gillet also acknowledged that the risk factors considered in his calculation of the appropriate risk premium were not specifically enumerated as risk factors in his report.

Creditor's counsel asked Gillet if the age of the borrower[10] could be considered a relevant risk factor. Gillet answered that although the age of a borrower may impact business operations, he

---

[8] Again, this remains the case in the fourth amended plan.

[9] Debtor's most recent monthly operating report, filed on October 20, 2015, reflects an even greater cash balance of $239,057.00.

[10] The Court takes judicial notice of the third amended plan/ disclosure statement filed on April 30, 2015, which states that the Debtor was 64 years old at that time. Likewise, the fourth amended plan/disclosure statement filed on October 27, 2015, also states that Debtor is 64 years old.

was not aware of any lender that uses age as a risk factor and questioned the legality of such a practice.[11]

Creditor's counsel asked Gillet about a number of hypothetical factors that could be considered relevant in a risk premium calculation. Gillet agreed that the lack of a budget for capital improvements, the inability to make any major maintenance repairs over the next three years, the existence of multiple complaints about facility operations, and insufficient income to justify the continued use of a property were all factors that could be relevant. However, except for a general statement as to maintenance and repairs with no specifics, Creditor's counsel did not provide any evidence to support these hypotheticals.

Regarding maintenance and the need for repairs, Gillet admitted that he did not spend any time at the Property before completing his expert report. Gillet testified that he believed that the Property was in average condition but in need of some repairs. However, Gillet lacked personal knowledge as to any specific repairs which might need to be made.

Gillet's only knowledge of maintenance issues would have come from the appraisal report completed by John Hibbard on August 10, 2012, which mentioned "significant deferred maintenance."[12] Apart from the general reference in the appraisal to significant deferred maintenance, no evidence was offered regarding the Property's specific maintenance needs. When

---

[11] As discussed infra, federal law prohibits treating a borrower's elderly age as a negative risk factor in determining creditworthiness. However, age may be considered as a positive factor.

[12] Page 54 of Hibbard's August 10, 2012 appraisal report was the only portion of the report admitted into evidence. The relevant language on page 54 states:

> Although the "market niche" of this facility [] has the effect of stabilizing the income to the facility, the history of the operation of the facility shows that the net income, after the extraordinary cost of staffing are met, is insufficient to produce a level of profit for the owner that is adequate to justify the continued operation. Moreover, the property does not generate sufficient income to provide for the periodic refurbish[ment] of the physical facility. The result is the property now reflects significant deferred maintenance, which threatens its continued operation.

The appraisal report did not identify any specific deferred maintenance at the Property.

asked about repairs that may be needed to maximize the value of the Property, Gillet noted that an appraiser may not have the requisite knowledge to understand what repairs would be required to continue operating a convalescent home.[13]  Gillet also testified that the excerpt from Hibbard's report referred to a higher and better use of the Property, which Gillet believed to be irrelevant as it did not reflect what was actually being done with the Property.  Gillet noted that maintenance can often be deferred or substituted with cheaper short-term solutions.  In addition, Gillet emphasized that Debtor's ability to pay for repairs was a minor concern, because Debtor would have additional income available to make such payments starting in year four of the proposed third amended plan.

        Creditor's counsel also asked Gillet about his familiarity with the Supreme Court's decision in Till, supra, and the distinguishing facts between that case and the present one.  Gillet agreed that Till involved a Chapter 13 case and that the case at hand is a Chapter 11.  Gillet also agreed that in Till, the proposed plan was for a duration of three years whereas here, the proposed third amended plan is to endure for twenty-five years.  While Gillet agreed that the risk of default is greater over twenty-five years, he also stated that the increased risk can be accounted for in the upward risk adjustment.  Gillet also testified that he used the 1% to 3% risk adjustment range mentioned in Till as a guideline in his determination of the appropriate risk adjustment.

        Creditor also elicited testimony from Gillet regarding a reference in his report concerning the availability of financing.  Paragraph 15 of Gillet's expert report states: "Given the availability of financing from major mortgage lenders such as Wells Fargo Mortgage, Bank of America, Chase, smaller local lenders and private financing the appropriate rate of default premium to add to the prime rate is 1.75% for an interest rate of 5%."  Although not specified within the report, Gillet testified that this paragraph refers to financing within the bankruptcy context for both commercial and residential properties.  Gillet testified that he has never worked for a lender and he did not contact lenders to see if they were, in fact, willing to make such loans to the Debtor.

---

[13] As discussed more fully infra, Hibbard's testimony at the valuation hearing equated the concepts of maintenance and renovation and related to the long-term profitability of Debtor's business.  Hibbard did not identify any specific repairs which he thought the Property needed, and he instead advocated for a wholesale renovation of the Property at a cost of $450,000.00 to make the business competitive and more profitable.

Creditor also inquired into paragraph 16 of Gillet's report, which states: "I base this decision on the published rates for available mortgages for 10-year fixed, 15-year fixed and 30-year fixed for a primary residence from major mortgage lenders and my understanding of those markets. In addition [sic], to analyzing the major banks 5-year fixed then adjustable, 7-year fixed then adjustable, and 10-year fixed then adjustable." Gillet explained that paragraph 16 was also applicable to commercial properties even though it only mentions primary residences. However, there were no written supplements to Gillet's report in this regard.

**II. Conclusions of Law**

The Court's sole task is to determine the appropriate rate of interest for Creditor's loan so that Debtor may include that interest rate in an amended combined plan and disclosure statement. Both parties were given a full opportunity to provide evidence on this issue. Creditor bears the burden of establishing any risk factors to justify a higher-than-prime interest rate.

**B. Formula Approach under Till**

The Court has already ruled that the Supreme Court's decision in Till, supra, applies to the case at bar, and that under Till, Creditor bears the burden of proof as to any risk factors which justify a particular interest rate. In Till, the Supreme Court identified the appropriate method to determine a cramdown interest rate in the context of a Chapter 13 case as the "formula approach." Under the formula approach, the Court calculates the appropriate interest rate by beginning with the national prime rate and then adjusting upward based upon any risk factors. Till, 541 U.S. at 479. These risk factors include, but are not limited to, the circumstances of the estate, the nature of the security, and the duration and feasibility of the plan. Id. The Supreme Court made clear that, "starting from a concededly low estimate and adjusting upward places the evidentiary burden squarely on the creditors[.]" Id.

In Till, the matter before the Supreme Court involved a Chapter 13 cramdown, but its analysis applies equally in the Chapter 11 context. To determine the appropriate interest rate in the case of a Chapter 11 cramdown:

> [A] bankruptcy court should apply the market rate of interest where there exists an efficient market. And, when no efficient market exists for a Chapter 11 debtor, then

the Bankruptcy Court should employ the formula approach endorsed by the Till plurality.

See In re Dunlap Oil Co., Inc., BAP No. AZ-14-1172-JuKiD, 2014 WL 6883069, at *19 (B.A.P. 9th Cir. Dec. 5, 2014); see also In re Seasons Partners, LLC, 439 B.R. 505, 517 (Bankr. D. Ariz. 2010) ("Some courts calculate the permissible interest rate for a Chapter 11 plan using a 'formula' approach, i.e., starting with a base rate - such as the prime rate or the rate on treasury obligations – and adding a risk factor.") (citing Camino Real Landscape Maint. Contractors, Inc., 818 F.2d 1503, 1508 (9th Cir. 1987)); In re LWD, Inc., 332 B.R. 543, 556 (Bankr. W.D. Ky. 2005), aff'd, 340 B.R. 363 (W.D. Ky. 2006); In re Texas Grand Prairie Hotel Realty, LLC, 710 F.3d 324, 333 (5th Cir. 2013) ("[T]he vast majority of bankruptcy courts have taken the Till plurality's invitation to apply the prime-plus formula under Chapter 11.").

In its trial brief, Creditor argued that the proposed interest rate of 5% fails to consider the following eight points: (1) the initial contract rate was 7.213% and was a variable rate; (2) the age and condition of the Property require several hundred thousand dollars of deferred maintenance; (3) Debtor's accrued taxes in excess of $125,000.00 will be paid off over a period of three years; (4) Debtor currently has no funds for capital improvements or to address deferred maintenance; (5) the Property is co-owned by a controlled entity of the Debtor, Golden Age Convalescent Hospital, Inc., which presents another bankruptcy risk; (6) Debtor is an elderly person; (7) Debtor's business is not subject to the jurisdiction of this Court; and (8) Debtor's income from the Property has been proven to be historically inadequate to make debt service payments. For the reasons discussed infra, all eight of these points either have no evidence to support them or have not been established as relevant risk factors.

Although Creditor had every opportunity to present evidence to satisfy its burden of proof, it presented absolutely no witnesses nor any persuasive evidence on its behalf. The only evidence of an appropriate interest rate came from Debtor's expert witness. Creditor chose only to cross-examine Debtor's witness.

Gillet testified that a 3.25% prime rate of interest plus a 1.75% risk premium adjustment, for a total of 5%, is an appropriate rate of interest for the loan on the Property. In doing so, Gillet

considered various factors, including Debtor's stipulations with Debtor's other secured creditors, Debtor's history of making timely payments and the existence of a cash cushion.

Creditor contends that a 5% rate of interest does not properly compensate against the risks involved in this case. However, despite being given a full opportunity to do so, Creditor has not presented any independent evidence supporting a greater risk adjustment premium, electing only to proffer evidence through cross-examination. Creditor did not identify any specific interest rate which Creditor believes would be more suitable. In fact, Creditor has not provided any suggestion as to how the Court should weigh the various risk factors, to the extent that any are present and not merely hypothetical.

On cross-examination, Creditor's counsel asked Gillet about several factors that could be considered relevant to determine the appropriate risk premium. Gillet agreed that the lack of a budget for capital improvements for a sixty three year old building, the inability to make any maintenance repairs over the next three years, the existence of multiple complaints against the operations of a facility, and the insufficient income to justify the continued use of a property, were all hypothetical factors that could be considered relevant in determining a risk adjustment. However, Creditor failed to present any evidence indicating that any of these hypothetical factors were in fact present in the case at hand, or present to a degree that would justify a higher interest rate.

Regarding the maintenance of the Property, Gillet did not spend any time at the Property and had no personal knowledge of the Property's condition. Nevertheless, Gillet assumed that the Property was in average condition and in need of some repairs. However, Gillet noted that it was likely that inexpensive repairs could be made in the short-term in order to maintain the Property. Gillet also pointed out that according to the proposed third amended plan, Debtor would have $3,539.02 per month in income after paying all expenses at the beginning of year four of the third amended plan. In addition, the third amended plan indicates that after year four, Debtor will have paid off expenses for professional fees, making at least an additional $10,000.00 per month available

to Debtor. These additional funds could be used by Debtor for capital improvements and maintenance repairs.[14]

Creditor's reference to the hypothetical existence of multiple complaints against the operations of the Property holds no weight. No evidence has been offered which would indicate that such complaints were ever made.

At trial, Creditor argued that an excerpt from Hibbard's appraisal report supported the notion that the continued operation of the Property could not be justified. However, this excerpt from the appraisal report addressed the highest and best use of the Property and made reference to "significant deferred maintenance" issues without ever specifying what those issues were. At the valuation trial before Judge Weissbrodt, Hibbard explained that the highest and best use[15] of the Property depended upon extensive remodeling of the Property at a cost of approximately $450,000. In his opinion, if the Property were remodeled, then the business would be more profitable. However, Hibbard never identified any specific items of deferred maintenance, and instead equated the concepts of deferred maintenance and renovation. Such conflation of concepts is not helpful in the current context; while a complete renovation of the Property would likely improve the profitability of the business, there was no evidence that the failure to make specific repairs would have any specific impact on business operations. Apart from Hibbard's testimony on the benefits of remodeling the Property, the passing reference in Hibbard's various appraisal reports to deferred maintenance "which threatens [the

---

[14] The court takes judicial notice of the fourth amended plan. The fourth amended plan appears to show less positive income available for repairs/maintenance than in the third amended plan. This was, however, only one factor that Gillet considered, and it was not the most significant factor underlying his expert opinion.

[15] Judge Weissbrodt observed in footnote 10 of the valuation decision that both parties assumed, perhaps incorrectly, that "highest and best use" was the appropriate test.

business'] continued operation" was never explained.[16] There was no evidence of any serious maintenance issues, nor any evidence of what it would cost to make repairs.

Creditor's assertion that Debtor's age is a relevant risk factor is also unsupported. On cross-examination, Gillet conceded that a debtor's age might have an impact on business operations. However, Gillet also testified that he is not aware of any lender that uses a debtor's age as a risk factor and questioned the legality of such a practice. Creditor has not provided any legal authority or evidence suggesting Debtor's age can or should be used as a relevant risk factor.

The Equal Credit Opportunity Act ("ECOA") prohibits discrimination on the basis of age in the decision to extend credit. See 15 U.S.C. § 1691. In fact, the ECOA -- by way of Regulation B -- allows a lender to inquire into and consider the age of an eldery credit applicant, so long as such consideration is favorable to the applicant. 12 C.F.R. § 202.6(b)(2)(ii) ("In an empirically derived, demonstrably and statistically sound, credit scoring system, a creditor may use an applicant's age as a predictive variable, provided that the age of an elderly applicant is not assigned a negative factor or value.") It is forbidden to assign elderly age a negative value in the creditworthiness determination. Therefore, the Court declines Creditor's invitation to treat Debtor's age as a negative risk factor.

At trial, Creditor also argued that the risk adjustment range of 1% to 3%, referenced by the Supreme Court in Till, does not suggest that the risk adjustment should be capped at 3% in this case. The Court agrees. In Till, the proper scale of the risk adjustment was not an issue before the Court, yet the Court noted that while courts generally approve a 1% to 3% risk adjustment, "courts must choose a rate high enough to compensate a creditor for its risk but not so high as to doom the bankruptcy plan." See Till, 541 U.S. at 466-67. However, Creditor has failed to demonstrate how a

---

[16] While not offered into evidence at this trial, there were several appraisals prepared by Hibbard during the course of this case which offered conflicting descriptions of the Property's condition. The earliest, filed on September 28, 2012, described the Property as "a well designed facility in above average condition." (Docket #173; Appraisal page 32). Another, filed on January 6, 2013, stated that the Property was a "one-story average quality wooden framed building[.]" (Docket #231; Appraisal page 14). That same appraisal also stated that the facility was "in below average condition and lacks adequate parking." (Docket #231; Appraisal page 24). The Court has not considered these prior appraisals in rendering the instant decision, but notes that the evidence of the Property's actual condition and/or need for maintenance has never been clear.

1.75% risk adjustment fails to compensate Creditor for its risk, or that a greater adjustment is warranted.

Moreover, under Till, the initial contract rate is of little to no significance; the Court starts with the prime rate and adds to it, depending on actual risks. Interestingly, if the Court were to consider the variable contract rate of prime plus 2.213% as a factor, then the current contractual rate would be 5.463% (3.25 + 2.213), which is far less than the initial contract rate of 7.213% and is much closer to the interest rate endorsed by Gillet.

Throughout the case and at trial, Debtor's counsel repeatedly pointed out that Creditor purchased the loan for only $500,000, yet holds a claim against Debtor for $1,829,167.73. The Court emphasizes that no weight has been given to this fact in determining the appropriate interest rate.

In sum, Creditor has failed to meet its burden in establishing any relevant risk factors which would support a greater rate of interest than what Debtor has proposed. Creditor's contention that a 5% interest rate does not adequately compensate Creditor is unsupported. Rather, Debtor has demonstrated that a 5% interest rate, consisting of a 3.25% prime rate and a 1.75% risk premium, is appropriate.

**\*\*\* END OF MEMORANDUM DECISION \*\*\***

**Court Service List**

Esterlita Cortes Tapang
2242 Pyle Court
Santa Clara, CA 95051

Other recipients are ECF participants